IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JOHN HART,

                Petitioner

       VS.

VICTOR WALKER, Warden,

                Respondent

NO. 5:04-CV-210 (CAR)

PROCEEDING UNDER 28 U.S.C. §2254
BEFORE THE U.S. MAGISTRATE JUDGE

---

# RECOMMENDATION

## PROCEDURAL HISTORY

Petitioner John Hart filed this petition for habeas corpus relief on July 6, 2004, attacking his 2003 conviction in the Superior Court of Crawford County, Georgia for the offense of voluntary manslaughter for which he had entered a negotiated plea of guilty. Tab #1. On November 2, 2004, the district court adopted the undersigned's recommendation to dismiss the petitioner's claim for failure to exhaust state remedies. Tab #18. The petitioner appealed that decision to the Eleventh Circuit which remanded the case to the district court with instructions to determine which of petitioner Hart's federal claims have been exhausted. On September 29, 2006, the court ruled that *all* of Petitioner's claims have been exhausted at the state level (Tab #39), and currently before the court are the memoranda in favor of the petition (Tab #40) and against the petition (Tab #33). On December 11, 2007, the undersigned conducted an Evidentiary Hearing on petitioner Hart's claims of ineffective assistance of counsel and matters related thereto at which testimony was presented by the petitioner, his family members, and Mr. Charles Jones, his attorney in the matter herein contested.

## LEGAL STANDARD

Once a petitioner has alleged facts which would entitle him to habeas corpus relief if proven to be true, it is incumbent upon the habeas corpus court to consider those facts in determining whether relief should be granted. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court determined that the standard to be applied in cases wherein ineffective assistance of counsel is alleged is whether the attorney's performance was deficient <u>and</u> whether that deficient performance prejudiced the defense. *Porter v. Wainwright*, 805 F,2d 930, 933 (11th Cir.1986). The Supreme Court later held in *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985) that the standard enunciated in *Strickland v. Washington* also applies to claims of ineffective assistance of counsel arising out of the entry of pleas of guilty.

Claims of ineffective assistance of counsel must be reviewed "from the perspective of counsel, taking into account all of the circumstances of the case, but only as those circumstances were known to him at the time in question." *Porter v. Wainwright, supra*, at 936 citing *Douglas v. Wainwright*, 714 F.2d at 1554 (quoting *Washington v. Watkins*, 655 F.2d 1346, 1356 (5th Cir. 1981)(Unit A), *cert.denied*, 456 U.S. 949, 102 S.Ct.2021, 72 L.Ed.2d 474 (1982). This standard requires that the circumstances as known to petitioner's attorney at the time of the entry of the guilty pleas be reflected in the record.

Petitioner HART is seeking habeas corpus relief based on three grounds: **(1)** ineffective assistance of counsel; **(2)** unknowingly and/or unwillingly entering a guilty plea; and **(3)** insufficient factual basis for guilty plea. Although these grounds for relief will be considered separately, it is clear that there is some over-lapping of argument both for and against each ground for relief.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner JOHN HART sets forth three arguments in support of his contention that his trial counsel was ineffective in representing him, to-wit: (1) trial counsel did not complete a minimally adequate investigation of the charge against his client or adequately prepare for trial; (2) trial counsel pressured petitioner HART into entering a plea of guilty to voluntary manslaughter, misinforming him that his family wanted him to do so; and, (3) trial counsel misinformed petitioner HART as to the length of imprisonment and eligibility for parole were he to be convicted of felony murder.

### INVESTIGATION AND PREPARATION FOR TRIAL

Petitioner Hart alleges that his trial counsel, Charles Jones, did not conduct a minimally adequate investigation of the charge against his client or adequately prepare for trial.[1] However, no credible evidence is before the court on behalf of petitioner Hart in support of this contention.  In response to questioning by counsel for the respondent at the Evidentiary Hearing, Mr. Hart himself testified as follows:

> Q.  Regarding Mr. Jones's investigation, you earlier testified, in fact, that you were incarcerated throughout the entire time from the date of the incident all the way up until the trial date; is that correct?
>
> A.  Yes. Sir.
>
> Q.  So you have no independent knowledge of what particular steps Mr. Jones took  to investigate you case, do you?
>
> A.  No sir.

---

[1]Although the focus of petitioner's contentions and argument is on the original charge of FELONY MURDER, it is important to note that Mr. Hart was actually charged with multiple counts in his indictment and was facing the possibility of imprisonment as to each count, to-wit:  FELONY MURDER— possible life imprisonment; AGGRAVATED ASSAULT— up to 20 years in prison;  POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY (2 counts)— 5 years in prison on each count.  In addition, petitioner was facing revocation of probation on a prior first offender plea on POSSESSION OF COCAINE for which there was the possibility of 15 years imprisonment.  Indeed, he was adjudicated guilty of this earlier offense at the time he entered his plea to the VOLUNTARY MANSLAUGHTER conviction under attack herein; he was sentenced to ten years imprisonment upon revocation of his sentence of probation, to run concurrently with his sentence of twelve years imprisonment on the VOLUNTARY MANSLAUGHTER conviction. The first offender revocation is not under attack herein.

Neither is petitioner's contention of failure to investigate supported by the two witnesses who appeared on his behalf at the Evidentiary Hearing.  T. 51 - T.66.

At the time of Mr. Hart's scheduled trial and subsequent change of plea, attorney Charles Jones had been practicing law for some nine year.  The bulk of his practice initially was criminal defense which constituted some 80% of his practice up until 2003; at the time he represented petitioner Hart in 2003, his practice was about 40% criminal defense. T.87.

Mr. Jones testified that he graduated from the University of Missouri with both a bachelor's and master's degree in public administration, worked for a while before going to law school, graduated from law school, and was admitted to the bar. T.86.

Counsel testified that he had represented petitioner Hart on two previous occasions, including petitioner's previous first offender drug charge for which revocation proceedings were pending based on the petitioner's 2003 indictment.  T.87.  He was retained by Mr. Hart to represent him on that indictment and the probation revocation proceeding.   Regarding the investigation pursued in representing the petitioner, and preparation for trial, Mr. Jones testified as follows:

(1) he had access to the State's file in accordance with the District Attorney's open file policy;  T.68.

(2) access to the State's file included access to Georgia Bureau of Investigation (GBI) investigations and summaries and witness statements; T.68

(3) he re-interviewed some witnesses that the GBI had already interviewed; T. 88.

(4) he interviewed witnesses whose names had been provided to him by Mr. Hart as probably being favorable to his cause, talking to some 13 or 14 people; T. 70.

(5) regarding the filing of motions on behalf of Mr. Hart, Mr. Jones determined that there was nothing in the way of the State's evidence that could be kept out; T.93.

(6) Mr. Hart had advised him that he wished to take the matter to trial; T. 95.

(7) Mr. Jones prepared written voir dire questions in advance of trial, did research on requests to charge and one in particular filed by the State, and prepared his own requests to charge; T.95.

4

(8) In preparation for trial, Mr. Jones wrote out his closing statement to the jury and possibly his opening statement, and talked with Mr. Hart about his right to testify or not testify; T.95.

(9) until the day of trial, both he and Mr. Hart had hoped that co-defendant Saffold would testify favorably at Mr. Hart's trial, but Saffold declined to do so; he subpoenaed Mr. Saffold; T.96-97.

(10) he received requests to charge from the State which included a request to charge on the offense of voluntary manslaughter (Respondent's Exhibit 5); T.98.

(11) he went over the State request to charge on the offense of voluntary manslaughter with Mr. Hart in advance of trial, noting that he and Mr. Hart "had a good bit of conversation about voluntary manslaughter as opposed to involuntary manslaughter as opposed to felony murder." T.98.

(12) Mr. Hart appeared to understand the State's request to charge that discussed voluntary manslaughter; T.99.

(13) he discussed the terms of the proposed plea agreement with Mr. Hart, noting "[w]e discussed quite a bit the difference between voluntary and involuntary." T.103.

(14) he prepared a letter dated May 31, 2003, (Exhibit 1 at hearing held on June 27, 2004, before the Honorable Tommy Day Wilcox, Superior Court Judge, on Mr. Hart's motion to withdraw his pleas of guilty) and hand delivered that letter to Mr. Hart on the Saturday before trial on Monday, summarizing their discussions, what he thought about the evidence against Mr. Hart, what he thought about the charges, "and what could happen as a consequence of being convicted of those charges, and the fact that ultimately it was his decision as to whether he went to trial or entered a plea." T.104.

(15) Mr. Jones' letter to Mr. Hart closed by stating: "This is your case. You make the decision of whether to enter a plea or go to trial. I am ready to proceed with whatever decision you make."

(16) Before writing the letter, Mr. Jones had discussed everything in the letter with Mr. Hart and "had spoken to him about at least twice and probably maybe more than that . . ."

(17)  During some six months before trial, Mr. Jones met with Mr. Hart on several occasions to talk about the case and trial strategy (T. 74), and immediately before trial, he had met with him three or four days in a row.

(18)  Prior to appearing for a change of plea, Mr. Jones discussed with Mr. Hart exactly what was going to occur at the hearing, advising him of his rights and what the judge would ask him; T.106-107.

As hereinabove noted, no credible evidence on the issue of investigation or trial preparation has been presented to the court save the testimony of attorney Jones.  Accordingly, the undersigned finds that Mr. Jones properly investigated and properly prepared the case for trial.

### TRIAL COUNSEL PRESSURED THE PETITIONER INTO PLEADING GUILTY

The second ground presented by petitioner Hart in support of his contention that his trial counsel provided ineffective assistance of counsel is that Mr. Jones pressured him into changing his plea from not guilty to guilty. As noted above, in *Strickland v. Washington*, *supra*, the Supreme Court established the standard to be applied in determining ineffective assistance of counsel by requiring a determination to be made as to whether the attorney's performance was deficient <u>and</u> whether that deficient performance prejudiced the defense.

Petitioner Hart testified that he was pressured into changing his plea of not guilty of the offense of Felony Murder to a plea of guilty of the offense of Voluntary manslaughter.  In particular, he argues that he would not have changed his plea but for the erroneous representation by his attorney that his family wanted him to plead guilty to the manslaughter charge.

Attorney Jones denies "pressuring" his client; he testified that during the break following jury selection, Mr. Hart inquired of him as to what his [Hart's] family thought, and that he "told him the family thought that he should take a plea."  T.109.  However, concerning his conversations with family members, he also testified in response to questioning by counsel for the respondent as follows:

> Q.  Okay. Regarding conversations you had with his family, do you have any recollection of you telling the family that they need to press Mr. Hart to take a plea, that they need to somehow coerce him or force him to take a plea in this particular matter?
>
> A.  No.
>
> Q.  Do you have any recollection of the family telling you that they wanted Mr. Hart to take a plea, that they wanted him to get the best deal possible from the state?
>
> A.  I remember them saying that he probably ought to take a plea.
>
> Q.  Okay.
>
> A.  Take a plea.
>
> Q.  And did you communicate accurately to Mr. Hart what his family said about whether or not he should take a plea?
>
> A.  If he asked me what they said, I'm sure I told him that they said that they think you ought to take a plea.

T. 105.

Two members of Mr. Hart's family, his sister, Angela Hart and his aunt, Diane Colbert testified at the Evidentiary Hearing that *they* never told Mr. Jones that they wanted Mr. Hart to change his plea.

7

Counsel for petitioner asked of Ms. Hart: "Did *you* ever express to Mr. Jones at any point in time that you wanted Mr. Hart to plead guilty?"  Her response: "No, I did not."  T.52.

Counsel for petitioner asked Ms. Colbert: "Did *you* ever express to Mr. Jones at any point in time that you wanted Mr. Hart to plead guilty?"   Her response: "No."  T. 57.

Petitioner himself testified that at his trial, there were some "10 or 15" people present to support him.  T. 27.

Attorney Jones testified that he met with family members on the Saturday before trial; there were a "group of people there." T. 83.  When the subject of entering a plea to a lesser offense arose, it "was the consensus of the group there" that Mr. Hart enter a plea of guilty to the lesser offense.  According to Ms. Colbert, the only family members present were Sonya Glover, Patricia Williams, and her.  Ms. Colbert testified that in response to Mr. Jones recommendation that Mr. Hart enter a plea of guilty to manslaughter, Patricia Williams said "it ain't up to us, it's up to John because he the one that's got to do the time . . . ."  Significantly, Ms. Colbert further testified that at the instance of Mr. Jones, she and Sonya Glover went to the jail "and told John what was said." T.64. They advised Mr. Hart that Mr. Jones said it was in his best interest to take the plea bargain. T.65.

While it is clear from the record that petitioner's sister and aunt did not tell attorney Jones that *they* wanted Mr. Hart to plead guilty to voluntary manslaughter, there is nothing in the record to refute the testimony of Mr. Jones that it was the consensus of *other family members* that petitioner Hart enter that plea.. The undersigned finds Mr. Jones' testimony on this issue to be credible.

On the Saturday before trial on Monday, attorney Jones visited with Mr. Hart in jail and hand delivered to him a letter.  *See* Exhibit 1, Transcript of Proceedings on June 27, 2003, on Motion to Withdraw Guilty Plea.  In that letter, Mr. Jones advised and reminded Mr. Hart of the following:

> (1) that they had met "several time" about the case, witness statements, and evidence;

> (2) that Mr. Hart's trial was scheduled to begin on Monday;

(3) that they had discussed what the jury might do based on the evidence;

(4) that he [Hart] still faced conviction on the felony murder charge even if the jury found that Mr. Saffold actually fired the shot that killed Ms. Boone;

(5) that if found guilty of the charges set forth against him in the indictment, he could be sentenced to the maximum sentences set forth in the letter;

(6) that he also faced revocation of probation on an earlier conviction;

(7) that revocation of his probation on the earlier conviction was likely;

(8) that they had discussed on two occasions the plea offer made by the prosecutor;

(9) that he [Jones] was fully prepared to go to trial;

(10) that although he is prepared to present a reasonable defense, the jury might return a guilty verdict based on the fact that most of the witnesses would say that he [Hart] shot first at Saffold;

Mr. Jones concluded his letter as follows:

> *My duty is to honestly tell you what I think the evidence is and what your options are.  That is the purpose of this letter.*  **This is your case.  You make the decision of whether to enter a plea or go to trial.**  *I am ready to proceed with whatever decision your make.* (Emphasis added).

9

Petitioner Hart also contends that he did not have enough time to make an informed decision on this issue of changing his plea: accordingly to Mr. Hart, after the lunch break, Mr. Jones told him that he had talked with his [Hart's] family during that break and they wanted him "to go for a plea." T. 29. Counsel for the petitioner and the petitioner engaged in the following colloquy at the Evidentiary Hearing:

> Q.  Do you feel like you'd had enough time to consider this guilty plea offer before you took it and before the trial began?
>
> A.  No, sir.
>
> Q.  How much time would you say you had between the time Mr. Jones came back from lunch and the time the trial was set to start?
>
> A.  About two minutes at the most, sir.
>
> Q.  Did you feel pressured under those circumstances?
>
> A.  Yes, sir.

Mr. Hart avers that his attorney never suggested before May of 2003 that it would be in his interest to take a guilty plea.  T. 23.  Testimony presented before the undersigned was to the effect that Mr. Hart entered his plea of guilty to voluntary manslaughter and violation of probation on June 2, 2003.  T. 16.  Attorney Jones' letter hand delivered to petitioner on May 31, 2003, specifically refers to the fact that he and Mr. Hart had "discussed on two occasions that the district attorney's office has offered to present a recommendation of 15 years in prison if you enter a plea of guilty to voluntary manslaughter."  *See* Exhibit 1, Transcript of Proceedings on June 27, 2003, on Motion to Withdraw Guilty Plea.  These "two occasions" would obviously have preceded May 31st .  In addition, as noted above, petitioner's aunt, Ms. Colbert, testified that on May 31st, at the instance of Mr. Jones, she and Sonya Glover went to the jail "and told John what was said." T.64. They advised Mr. Hart that Mr. Jones said it was in his best interest to take the plea bargain. T.65.

While it is purely a matter of conjecture how many days or weeks Mr. Hart *may* have known of the state's plea offer, it is apparent that Mr. Hart was aware of the state's recommendation much earlier than the day of trial. In the view of the undersigned, even learning of such an offer on the Saturday before trial on Monday was sufficient time to permit him to make an informed decision about changing his plea.

Accordingly, the undersigned finds that petitioner's allegation that he was pressured into pleading guilty to voluntary manslaughter lacks merit and is unsupported by the evidence presented at the evidentiary hearing.

### TRIAL COUNSEL MISINFORMED PETITIONER HART AS TO LENGTH OF IMPRISONMENT AND ELIGIBILITY FOR PAROLE

Petitioner Hart's third argument in support of his contention that his trial counsel was ineffective focuses on misinformation allegedly given to him by his attorney as to length of imprisonment and eligibility for parole. Petitioner Hart alleges that his attorney told him that if convicted of felony murder, he would face life imprisonment. He says, however, that his attorney failed to advise him that in the event of conviction on the murder charge, he would be eligible for parole after serving 14 years. Petitioner avers that had he known of the eligibility for parole in 14 years, he would have gone to trial on the charge of felony murder and defended himself (because he believed he was innocent) since the difference between 14 years and the 12 year sentence he was to receive under the plea agreement for entering a plea of guilty to voluntary manslaughter was so close.

O.C.G.A. §42-9-45 provides in pertinent part:

(b) An inmate serving a misdemeanor sentence or misdemeanor sentences shall only be eligible for consideration for parole after the expiration of six months of his or her sentence or sentences or one-third of the time of his or her sentence or sentences, whichever is greater. ***Except as otherwise provided in Code Sections 17-10-6.1 and 17-10-7, an inmate serving a felony sentence or felony sentences shall only be eligible for <u>consideration</u> for parole after the expiration of nine months of his or her sentence or one-third of the time of the sentences, whichever is greater.*** Except as otherwise provided in Code Sections 17-10-6.1 and 17-10-7, inmates serving sentences aggregating 21 years or more shall become eligible for consideration for parole upon completion of the service of seven years. (Emphasis added).

Trial counsel testified at the hearing that he, in essence, did not discuss parole with petitioner Hart.  T. 84.  He further testified that "as a standard practice" he does not "talk much about parole because parole rules change so often."  T. 85.

Release on parole in Georgia is determined by the Board of Pardons and Paroles.  It is a matter of conjecture if and when parole will or will not be granted at a given time. The Parole Board is given a great deal of discretion in considering requests for parole.  O.C.G.A. § 42-9-45(b) does not *mandate* release on parole after one has served one-third of his sentence. That statute simply provides that an inmate serving a felony sentence shall only be eligible for *consideration* for parole after the expiration of nine months of his sentence or one-third of the time of the sentence, whichever is greater. Thus, while an inmate serving a felony sentence must serve a minimum of nine months or one-third of his sentence (whichever is greater), the Parole Board is not required to actually release, or to even consider releasing, him on parole at a particular time.

In the case at bar, counsel for Mr. Hart testified that he advised his client of the maximum sentence he was facing on the felony murder charge. In fact, in counsel's letter to his client dated May 31, 2003, counsel advised him of the maximum sentences which could be imposed upon him in the event of convictions on *all* of the charges for which he was indicted, as well as the sentence he could expect if his probation on an earlier [first offender] drug conviction were to be revoked. Furthermore, counsel testified that he "wrote the letter, everything in that letter, I had spoken to him about at least twice and probably maybe more than that . . .." T. 77.  He further testified that Mr. Hart appeared to understand the information contained in the letter.  T. 78.

Petitioner's argument lacks credibility for a very simple reason: he seeks to convince the court that his decision to continue with trial was affected by his comparison of his *eligibility* for parole on a conviction for murder with the *maximum* period of incarceration on a conviction for voluntary manslaughter.  Comparing a maximum sentence and the time an inmate becomes eligible for parole is like comparing apples and oranges, however.

Under O.C.G.A. §42-9-45(b), petitioner Hart would be eligible for parole on the voluntary manslaughter conviction in one-third of the 12 year sentence imposed upon him in this case.  Thus, the difference becomes one of 10 years, not 2 years — 14 years eligibility on a murder conviction versus 4 years eligibility on the voluntary manslaughter conviction.  It is thus not credible to believe that such an improper comparison would reasonably have affected any decision by petitioner Hart to continue with his murder trial or to enter a plea of guilty to the charge of voluntary manslaughter. There certainly would have been no guarantee that parole would have been granted in 14 years had he been convicted of felony murder.

Applying the standard enunciated in *Strickland v. Washington, supra*, and *Hill v. Lockhart, supra*, the undersigned find that the performance of trial counsel in representing petitioner Hart was not deficient and that no actions or inactions on his part prejudiced the petitioner.

### UNKNOWINGLY AND/OR UNWILLINGLY ENTERING A GUILTY PLEA

The gravamen of petitioner Hart's contention that he did not knowingly and willingly enter a plea of guilty to the charge of voluntary manslaughter lies in his argument that he did not understand the nature and the elements of the offense.  Petitioner argues that neither the trial judge nor defense counsel advised him that "intent to kill" was an element of the crime to which he pled. As pointed out by counsel for the petitioner in Petitioner's Response to Supplemental Brief of Respondent, intent to kill is an essential element of both murder and voluntary manslaughter.[2]

---

[2] *See*, e.g., *Parks v. State*, 254 Ga. 403, 414, 330 S.E.2d 686, 697 (1985) ("Intent to kill is an essential element of both murder and voluntary manslaughter."); *Sparks v. State*, 277 Ga. 72, 74, 586 S.E.2d 645 (2003) ("Voluntary manslaughter presupposes an intentional killing . . . .'"); *Ramsey v. State*, 272 Ga. 28, 29, 526 S.E.2d 842, 845 (2000) ("[I]ntent to kill is an element of voluntary manslaughter."); *Ballard v. State*, 150 Ga. App. 704, 706, 258 S.E.2d 331, 333 (Ga. App. Ct.1979) (quoting *Cochran v. State*, 146 Ga. App. 414, 415,246 S.E.2d 431, 432 (Ga. App. Ct. 1978) ("[T]he homicide was neither accidental nor malicious it was intentional, and therefore was voluntary manslaughter.").

The trial judge at the plea hearing noted that Mr. Hart was before him to enter a plea of guilty to "a lesser included offense in Count One, felony murder, to the offense of voluntary manslaughter." In addition, he noted that all other [new] charges would be "nol prossed or dismissed" and that petitioner Hart would also be disposing of a pending charge of violating his sentence of probation in an earlier 1999 drug case (for which Mr. Hart had been on first offender probation) by entering a plea of guilty to that charge.  Transcript of Guilty Plea Proceedings, pp. 1, 5.

The trial judge then advised Mr. Hart of the elements of felony murder and noted that "the State is willing to reduce the charge of felony murder to voluntary manslaughter.  Is that what you understand?".  Petitioner Jones responded in the affirmative.  The judge then advised Mr. Hart of the maximum penalty for voluntary manslaughter (twenty years) but further stated that [under the plea agreement], Mr. Hart was to be sentenced to twelve years in the penitentiary with credit for time already served in custody.  Petitioner Hart stated that this was his understanding.   The judge then dealt with Mr. Hart's plea to violating probation in the 1999 drug case.  Transcript of Guilty Plea Proceedings, pp. 3-5.

In the course of addressing Mr. Hart, the trial judge touched briefly on the facts surrounding the shooting of the victim, Jennifer Boone, noting that the shooting occurred as a result of the heated passion between Mr. Hart and one Saffold who had been firing pistols at each other.  In the course of the court's addressing Mr. Hart, the judge recognized  Mr. Hart's contention that Saffold was the one who actually fired the gun that killed Ms. Boone when Hart responded to the judge's question as to whether he understood the facts to be as stated by the judge by saying "I understand she was killed, Your Honor, but, you know, –."   Transcript of Guilty Plea Proceedings, pp. 3-4.

Before concluding the guilty plea hearing, the trial judge asked the prosecutor to state the factual basis for Mr. Hart's plea to voluntary manslaughter.  The prosecutor then set forth in detail the state's contention as to what occurred when Ms. Boone was killed.  Thereafter, the court agreed to accept Mr. Hart's plea of guilty, and he tendered his plea in writing and was sentenced in accordance with the plea agreement.   Transcript of Guilty Plea Proceedings, pp. 8-13.

Trial counsel for the petitioner testified as follows at the evidentiary hearing before the undersigned held herein:

(1) that he received requests to charge from the State which included a request to charge on the offense of voluntary manslaughter (Respondent's Exhibit 5).

(2) that he went over the  State request to charge on the offense of voluntary manslaughter with Mr. Hart in advance of trial, noting that he and Mr. Hart "had a good bit of conversation about voluntary manslaughter as opposed to involuntary manslaughter as opposed to felony murder." T.98.

(3) that Mr. Hart appeared to understand the State's request to charge that discussed voluntary manslaughter; T.99.

(4) that he discussed the terms of the proposed plea agreement with Mr. Hart, noting "[W]e discussed quite a bit the difference between voluntary and involuntary."  T.103.

(5) that in his opinion, Mr. Hart appeared to understand the differences between voluntary and involuntary manslaughter.

(6) that he considered a plea to voluntary manslaughter to be in Mr. Hart's best interest based upon his investigation. T.112.

Case 5:04-cv-00210-CAR   Document 52   Filed 07/21/09   Page 16 of 23


The question thus arises whether the actions of the trial judge and of petitioner's attorney *sufficiently* advised Mr. Hart of the nature and consequences of a plea of guilty to the offense of voluntary manslaughter so as to satisfy the requirements of law.  Notwithstanding the fact that the elements of the crime of voluntary manslaughter could have been explained in more detail by the trial judge,  in the view of the undersigned, Mr. Hart was adequately advised of both the nature of his plea and the consequences.  To be sure, it may have been difficult, and still is difficult, for Mr. Hart to fully comprehend the fact that the element of intent to kill could be established by his actions in engaging Mr. Saffold as opposed to his actually forming in his mind an intent to shoot Ms. Boone.[3]  Nevertheless, Georgia law permits a finding that such a shooting constitutes voluntary manslaughter.  In the case of *Coker v. State*, 209 Ga.App. 142, 433 S.E.2d 637 (1993), wherein a shot fired by someone other than Coker strayed and killed a bystander, the court quotes from *Strickland v. State*, 9 Ga.App. 552(1), 72 S.E. 919 (1911) in stating:

> *Where one shoots at another, intending to kill him, under such circumstances that the killing, if accomplished, would be voluntary manslaughter, but the shot misses him and accidentally kills an innocent third person, the homicide will be voluntary manslaughter.*[4]

---

[3] The Georgia Court of Appeals in *Fussell v. State*, 187 Ga.App. 134, at 136, 369 S.E.2d 511 (1988), stated that "[w]hen an unintended victim is struck down as a result of an unlawful act actually directed against someone else, the law prevents the actor from taking advantage of his own wrong and transfers the original intent from the one against whom it was directed to the one who actually suffered from it. 'In legal contemplation, the intent follows the act through to its legitimate results.'"  *Cook v. State*, 255 Ga. 565, 566(1), 340 S.E.2d 891 (1986)

[4] The undersigned is aware that the Supreme Court of Georgia has addressed *contested* proceedings wherein requests for instructions to be given to the jury in felony murder prosecutions have included requests for instructions on voluntary manslaughter.  That court has noted that "the voluntary manslaughter statute, O.C.G.A §16-5-2(a) should be construed so as to authorize a conviction for that form of homicide only where the defendant can show provocation *by the homicide victim*." (Emphasis added).  *Foster v. State*, 264 Ga. 369, FN2, 444 S.E.2d 296 (1994). However, in the view of the undersigned, a distinction can be made between contested proceedings and proceedings such as the one at bar wherein a negotiated plea to a lesser included offense is involved.

16

The Supreme Court held in a New York case that a guilty plea to second degree murder was involuntary where it was established *as a fact* that the defendant had not been informed and was not aware that under New York law, intent to kill was an essential element of the offense to which he pled. The Court stressed that the defendant's plea could not be voluntary when no one had explained to the defendant that his plea was an admission to having the specific intent to kill. *Henderson v. Morgan*, 426 U.S. 637, 646, 96 S.Ct.2253, 2258, 49 L.Ed2d 108 (1976). However, as noted in *DeVille v. Whitley*, 21 F.3d 654, 657 (5th Cir.1994):

> The Henderson Court did not purport, however, to lay down an absolute requirement that the technical elements of an offense be recited to a defendant. A plea will be upheld if it is shown by the record, or the evidence adduced at an evidentiary hearing that a defendant understood the charge and its consequences when he pled guilty. *Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir.), *cert. Denied*, 474 U.S. 838, 106 S.Ct. 117, 88 L.Ed.2d 95 (1985).

It is clear from the record of petitioner's guilty plea proceeding and from the testimony of defense counsel at the evidentiary hearing (which the undersigned finds to be credible) that at the time of entering his plea of guilty to voluntary manslaughter, petitioner Hart understood both the charge and the consequences of his plea. The sentence which was imposed upon him was well within the maximum sentence provided by Georgia law. Consideration of the totality of the circumstances surrounding trial counsel's discussions with his client regarding voluntary manslaughter, as well as the trial judge's development of the facts of the shooting of the victim, convinces the undersigned that petitioner Hart's plea was both knowing and willing.

In addition, it is not insignificant that in response to direction from the trial judge, the prosecutor set forth on the record the facts which the State believed would be established had the case proceeded to trial. The facts alleged by the prosecutor satisfied the elements of the charge to which Mr. Hart was pleading guilty. *See Henry v. State,* 284 Ga.App. 439, 440, 644 S.E.2d 191, 192 (2007) ; *Green v. State*, 265 Ga. 263, 265(2), 454 S.E.2d 466 (1995).

17

## BEST INTEREST PLEA?

In addition, in the view of the undersigned, a strong argument can be made that petitioner's plea was a "best interest" plea under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).  *Alford* permits a plea of guilty to be taken even though a defendant claims actual innocence, as did petitioner herein, provided there is a factual basis for the plea.  An accused may voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit to the crime charged against him or even if his guilty plea contains a protestation of innocence.  *Id*. at 166, 167. [5]

As noted above, at the guilty plea hearing, petitioner Hart appears to have begun a protest of his innocence ("I understand she was killed, Your Honor, but, you know, –." but was cut short by the trial judge who noted "Mr. Saffold is the one that fired the gun that killed her."   Transcript of Guilty Plea Proceedings, pp. 3-4.)  The trial judge recognized Mr. Hart's claim that a bullet from the gun of Mr. Saffold actually killed the victim— not a bullet from Mr. Hart's gun.

There are a number of factors present in this case which lend credence to a finding that the plea entered by petitioner Hart was, in fact, a "best interest" plea.  Although it is conceded that there is no mention during the plea colloquy *per se* of an *Alford* plea or "best interest" plea, it appears that the old axiom "if it walks like a duck and quacks like a duck, it must be a duck" may be applicable, to-wit:

---

[5] "While most pleas of guilty consist of both a waiver of trial and an express admission of guilty, the latter element is not a constitutional requisite to the imposition of criminal penalty.  An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."  Where "a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilty," a plea may be accepted even if accompanied by protestations of innocence."  *Alford*, at 28-29.

(1)   In the questioning of petitioner's aunt, Diane Colbert, by counsel for petitioner Hart at the evidentiary hearing, the following was elicited at T. 58-59:

> Q.  I want to make sure I understand your testimony.  You had a conversation with Mr. Jones about what Mr. Hart should do, correct?
>
> A. We had a meeting before court.
>
> Q. And what did you tell Mr. Jones was your opinion at that meeting?
>
> A. That whatever John decided to do was John, because I couldn't tell John what to do.  He wanted us to go tell John to take the plea because that was *in his best interest*, but we said we would go over there and tell John what he said, but it was up to John to do whatever.

(2) On examination of Ms. Colbert by the undersigned at the evidentiary hearing, the following occurred at T. 62:

> Q. All right, and during the course of that conversation with Mr. Jones, did he tell you about the trial coming up Monday?
>
> A. Yeah, he told us that he see that in John's *best interest* is for John to take a plea.

(3) Continuing the court's examination of Ms. Colbert at T. 63:

> Q. All right. Now, at the time that Mr. Jones discussed this with you, he did bring up the idea about Mr. Hart changing his plea; is that right?
>
> A. No.  He came and told us to go talk to John.
>
> Q. Okay.
>
> A. That was before the trial.  And tell him that it would be *in his best interest* if he would  not go before the jury, just take the plea bargain.

(4) On examination of attorney Charles Jones by counsel for the petitioner at T. 67-68:

Q. . . . When did you first decide – did there come a time when you believed it would be in Mr. Hart's **best interest** to plead guilty?

A. Yes.

Q. When did that happen?

A. After John described to me what happened, I'm sure I went and called the assistant district attorney who was handling the case to find out from him a little bit about what took place also.  I was aware that John was on probation at the time, that he was not supposed to be in possession of a firearm, and I knew that would be an issue as well. I can't tell you a specific time when I decided it's in John's **best interest**, but I would think it would be after I had an opportunity to review the evidence in the case.

(5) Examination of Mr. Jones by counsel for petitioner Hart, continuing at T. 74-75:

Q. Do you recall the first time that you told John that you believed it was in his **best interest** to take a guilty plea instead of defend at trial?

A. I would think that would have been after we had access to the State's file.  Part of the confusion that we had during the – and when I say confusion, I don't mean confusion of my part – John was charged, I believe, with felony murder and the issues in the case suggested, well, was that he didn't shoot anybody.  He did not shoot the victim.  And that concept was a little bit difficult for John to understand, and that's why I made sure I spoke not only with John, I spoke with his family on a number of occasions just trying to explain what felony murder was and trying to explain exactly what we were facing in terms of what I saw the evidence to be and what I expected the evidence to be at trial.

20

Q. And you set some of that out in the May 31st, 2003 letter to John, is that – do you remember that letter?

A.  I remember a letter that I wrote right before trial, and I tell you, I did that because I was meeting with the family and explaining to them this process, and I think they understood what I was saying, and I was meeting with John, explaining to him about the process also and the charges and what could happen at trial, and I knew that there was – I wanted to make sure that everybody was clear about my position, and I think that's the letter that I took to John the day before trial where I indicated to him, you know, what he was charged with, what he could get if he was convicted, what I thought the evidence would be, and I think the last thing I told – put in the letter was I was prepared to go to trial, but it's his choice as to what he chose to do.

Q. So it is fair to say your position was you thought that it was in his **best interest** to take a guilty plea?

A. Oh, definitely.

Q. Before the trial started, before June 2nd?

A. Definitely.


(6) Questioning by the court of counsel for the petitioner at T. 112:

Q. Clearly, in your mind was this a **best interest plea** for Mr. Hart?

A. Yes, sir, your Honor.


(7) Finally, in the plea colloquy before the trial judge, the following exchange took place at Transcript of Guilty Plea Proceedings, p. 7:

THE COURT: Mr. Jones, you've been on the case for a while now, thoroughly investigated it, I'm sure.  Are you satisfied that based upon the facts in this case and the law as you understand, this plea is in Mr. Hart's **best interest**?

MR. JONES: Yes, Your Honor.

(Emphasis added to transcript quotations).

21

In the view of the undersigned, notwithstanding the determination hereinabove made that petitioner Hart's plea of guilty as a "standard" plea was in accord with the requirements of law, there is sufficient evidence to also permit a finding that  the plea entered by petitioner Hart was a "best interest" plea received in accordance with *North Carolina v. Alford*, *supra*.

### INSUFFICIENT FACTUAL BASIS FOR A PLEA OF GUILTY

Petitioner's final argument concerns the factual basis supporting his plea of guilty to the offense of voluntary manslaughter.  He avers that there was no basis in fact to permit the trial court to accept a plea of guilty.

In considering other grounds for relief presented by petitioner Hart, the undersigned has already addressed the factual basis for petitioner's plea, the findings of which are incorporated herein. As noted above, the factual basis for petitioner's plea was clearly set forth by the prosecutor during the plea colloquy.  The death of the victim occurred as the result of gunfire between petitioner Hart and Mr. Saffold whose case had already been disposed of; a stray bullet most likely coming from Mr. Saffold's gun struck and killed Ms. Boone.  However, the prosecutor considered petitioner Hart to be the aggressor in firing first on Mr. Saffold.  Although petitioner Hart disagreed that the shot killing Ms. Boone came from his gun, he did not deny the facts of the killing as presented by the prosecutor.  After the prosecutor stated the State's contentions, the court declared "[w]e'll accept the plea, Mr. Hart, if that's what you want to do."  Thereupon, petitioner Hart entered his plea of guilty in writing.   Transcript of Guilty Plea Proceedings, p. 10.

Accordingly, the undersigned finds no basis in law or fact for the petitioner's contention that there was an insufficient basis for a plea of guilty.

## CONCLUSION

For all of the foregoing reasons, the undersigned finds that the petition of JOHN HART seeking a writ of habeas corpus must be DENIED.  IT IS SO RECOMMENDED.  Pursuant to 28 U.S.C. §636(b)(1), the parties may file written objections to this RECOMMENDATION with the Clerk of court directed to the district judge assigned to this case, **WITHIN TEN (10) DAYS** after being served with a copy thereof.

SO RECOMMENDED, this 21st day of JULY, 2009.



CLAUDE W. HICKS, JR.
UNITED STATES MAGISTRATE JUDGE